UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                  )
UNITED STATES OF AMERICA          )
                                  )
      v.                          )    CR. No. 03-10393-MLW
                                  )
STEVEN VARGAS                     )
      defendant                   )
_____ )

DEFENDANT'S SENTENCING MEMORANDUM

**I.   Introduction.**

Defendant Steven Vargas submits this Memorandum, together with the separately submitted Forensic Evaluation of Mr. Vargas by Helene Presskreischer, to assist the court in determining the appropriate sentence. For the reasons set forth below, the Court should sentence Mr. Vargas to a term of two years, with a recommendation that he be admitted to the Bureau of Prisons' Residential Drug Program. The defendant also requests that the Court recommend that he serve his sentence at FCI Fort Dix, or if that facility is not available, at the nearest facility to the District of Massachusetts that has a Residential Drug Program. The sentence the defendant requests is "sufficient, but not greater than necessary, to comply with the purposes set forth in Paragraph 2 of this subsection." 18 U.S.C. § 3553(a). Those purposes are: to reflect the seriousness of the offense; to deter criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care or other correctional treatment. Section 3553(a)(2)(A-D). Congress has glossed the last of these purposes in 18 U.S.C. §3582(a):

> The court, in determining whether to impose a term of imprisonment,
> and, if a term of imprisonment is to be imposed, in determining the

> length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

(Emphasis added). The sentence requested by the defendant is a serious sentence, especially given that he has been incarcerated only once before, for nine months, reflects the seriousness of the offense, effects deterrence of the defendant and others from committing further crimes, and takes into account serious and pressing need that the defendant has for drug abuse treatment. Drug abuse, as is made clear both in the Presentence Report and in Dr. Presskreischer's evaluation, is at the heart of Mr. Vargas' criminal offenses.

## II.    Argument.

### A.    The Court Is No Longer Required To Impose A Sentence Derived From Calculations Under The United States Sentencing Guidelines.

*United States v. Booker*, 125 S. Ct. 738 (2005) rendered the Sentencing Guidelines an advisory system by striking down 18 U.S.C. §3553(b)(1). "[W]ithout this provision – namely the provision that makes 'the relevant sentencing rules mandatory and impose[s] binding requirements on all sentencing judges' – the statute falls outside the scope of *Apprendi's* requirement." *Id.* at 764. With section 3553(b)(1) gone, "the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." *Id.* The last part of that assertion – that Guidelines are to be considered "together with other sentencing goals" undercuts any position that the Guidelines should provide the presumptive sentence in the mine run of cases. After *Booker*, the Guidelines provide guidance to the Court, but it is but one of the statutorily required factors to be considered.

The contrary position has been rejected pointedly by a number of courts that have imposed sentences post-*Booker*. In *United States v. Ranum*, 353 F.Supp.2d 984 (E.D. Wisconsin 2005), the

Court expressly ruled that the Guidelines, rather than encompassing all of the § 3553(a) sentencing factors, in fact conflict with, and prohibit courts from considering, many of those factors. *Id.* at 985-986 (Guidelines discourage or prohibit consideration of much of "history and characteristics of the defendant" which is called for by section 3553(a)(1), and with directive of section 3553(a)(2)(D) to evaluate need for treatment or education). Accord *United States v. Cherry*, ___ F.Supp.2d ___, 2005 WL 991432 at *6 (E.D.Va. April 25, 2005); *Simon v. United States*, 361 F.Supp.2d 35, 40 (E.D.N.Y. 2005); *United States v. Myers*, 353 F.Supp.2d 1026(S.D. Iowa 2005)*; United States v. Jones*, 352 F.Supp.2d 22(D. Me. 2005). See also *United States v. Pirani*, ___ F.3d ___, 2005 WL 1039976 at *17 (8th Cir. April 25, 2005)("the correctly calculated guideline range presumably carries equal weight with the other §3553(a) factors."). Contra *United States v. Wilson*, 355 F.Supp.2d 1269 (D. Utah 2005). The Second Circuit, in *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) concluded that after *Booker,* the sentencing judge is entitled to find all facts appropriate to guidelines *and* nonguidelines sentence and is expected to "discharge [his] statutory obligation to 'consider' the guidelines and all the other factors listed in section 3553(a)"). Cf. *United States v. Antonakopoulos*, 399 F.3d 68, 83 (1st Cir. 2005)(family circumstances that would not allow for downward departure under Guidelines a "nonfrivolous" ground for resentencing after *Booker*).

Judge Gertner of this District, in *United States v. Jaber,* 362 F.Supp.2d 365 (D. Ma. 2005), while noting that the guidelines remain an important part of sentencing even after *Booker*, concurs that they must be considered along with the other section 3553(a) factors rather than being given "heavy" weight allowing for deviation only in unusual cases, disagreeing with *Wilson*, *supra.* She argued that other statutory sentencing factors must be considered in addition to the guidelines, *inter alia*, because the guidelines did not implement those statutory sentencing factors, nor do they

comprehend the "vast range of human conduct potentially relevant to sentencing." *Id.* at 372-74. See also *United States v. Myers*, 353 F.Supp.2d 1026, 1028 (S.D. Iowa 2005), ("In citing *Ranum*, [*supra*,] this Court does not mean to be unduly harsh about the wisdom contained in the Guidelines, for wisdom is there. Wisdom, however, also resides in the other statutory sentencing factors, but was not allowed expression under the former mandatory scheme.")

It is thus clear after *Booker*, not only that the guidelines are not binding, but that courts, in consideration of the other statutory sentencing factors in section 3553(a), need not justify a sentence outside of the guidelines by finding grounds for departure that take the case outside the "heartland." Rather, courts have the discretion to impose a sentence outside the range proposed by the guidelines, so long as the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.

B.  The Court Is Now Required To Impose A Sentence Sufficient But Not Greater Than Necessary To Comply With the Purposes Set Forth in 18 U.S.C. ß 3553(a)(2)

After *Booker*, the touchstone in each case is a sentence sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a). That section provides in relevant part as follows:

> (a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>    (2)   the need for the sentence imposed--
>       (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>       (B)   to afford adequate deterrence to criminal conduct;
>       (C)   to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the [United States Sentencing G]uidelines
> > . . . .
>
> (5) any pertinent policy statement--
>
> > (A) issued by the Sentencing Commission . . . .
> > . . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.[1]

Accordingly, if the court examines all of the criteria set forth above and determines that a given sentence is "sufficient, but not greater than necessary" to obtain the sentencing objectives articulated in § 3553(a), it should impose that sentence. For the reasons that follow, that analysis should lead to the sentence proposed above in this case.

### III. Application to This Case.

#### A. The Sentence Requested Is Appropriate Given The Nature And Circumstances Of The Offense And The History And Characteristics Of The Defendant.

*The Offense*

Mr. Vargas committed a serious offense, and concedes that a significant term of incarceration is appropriate. Between November, 2001 and February, 2002, while he was in the U.S. Army assigned to Ft. Campbell, Kentucky, Mr. Vargas purchased 11 handguns from 2 Kentucky pawnshops, removed the serial numbers and sold them in Massachusetts. When questioned by ATF agents in the fall of 2003, he ultimately admitted this, and told them further that he had mailed 2 of

---

[1] There is no suggestion in the Presentence Report that restitution is an issue in this case.

them understanding they would be sold to Dominican drug dealers who would then send them to the Dominican Republic and that he carried the remaining guns with him on trips to Massachusetts in the spring of 2002, during leave from duty, and sold them at a profit.

The guideline calculations derived from this, which do not take into account Mr. Vargas' personal history or his family circumstances, discussed below, but taking into account his criminal history garnered shortly after the gun sales, call for a sentence range of 37-46 months.

*History And Characteristics of Mr. Vargas.*

Mr. Vargas' personal history, his long-term battle with drug addiction and impulse-control, his efforts to hold on to his relationships with his wife and four children, all are factors that counsel a sentence lower than the guideline range, and especially counsel that Mr. Vargas be afforded sustained, intensive treatment for his drug addiction, which is the source of his criminal behavior. Mr. Vargas' story, as set forth in the Presentence Report, ¶¶ 42-78 and amplified in Dr. Presskreischer's Evaluation (which will be submitted separately, in hard copy, to the Court), implicates both recidivism, section 3553(a)(2)(B), and the need for medical treatment, section 3553(a)(2)(D).

From childhood, Mr. Vargas has been exposed to drug abuse and violence. His mother was in an abusive relationship starting when he was 3. He lived for several years in foster homes, and when he returned to live with his mother in the Crown Heights section of Brooklyn, she neglected him, leaving him and his brother alone at night, inferably while she did drugs. Mr. Vargas was angry and out of control at school, leading to several psychiatric evaluations. At age 12 he spent 6 months in a psychiatric hospital. At age 13 he was placed in a residential school, Hillcrest, in Western Massachusetts, where he remained for 2 years, and initially did well. However, he did not accept

medication and eventually he ran away.

He ended up back with his mother and her new boyfriend, who had Mr. Vargas get drugs for him. He did not return to school, but began to use marijuana and cocaine, and live on the streets. He recognized that he needed a different environment, and left his mother to live with the family of a friend in upstate New York. His stay was interrupted by a life-threatening liver abscess for which he was hospitalized for 6 months. He returned to upstate New York after release from the hospital, but his friend and he started using marijuana together, however, and after several months he had to leave. He ended up living with a drug dealer and started using cocaine heavily.

Again, he recognized the need to get away from this environment, and moved to Dracut, Massachusetts, where his mother had moved, enrolled in the Job Corps and stopped using drugs. In 1997 he met Lilly Ruiz (they married in 1999 and are still married). He left the Job Corps and took a job at Cambridge Tool in Billerica, a job he held until his enlistment in the Army. They had their first child in February, 1998. In hopes of providing a better life for his son, Mr. Vargas enlisted in the Army in October, 1998. He and Lilly had a second child in April, 1999. He ended up at Fort Campbell at the end of 1999, and his family joined him there. They had a third child in September, 2000. Lilly, who spoke little English, felt isolated at Fort Campbell, and in the fall of 2001, she returned with their children to Massachusetts while Mr. Vargas remained at Fort Campbell.

With the stabilizing influence of his family removed, Mr. Vargas once again succumbed to drugs, which were, he reported, readily and abundantly available at Fort Campbell. It was at this point that he began purchasing guns in Kentucky and selling them in Massachusetts. The money went for drugs. Shortly after he sold the guns, Mr. Vargas was arrested for shoplifting $54 in merchandise from the base store, in May, 2002. He continued to use drugs, but again he tried to

extricate himself, as he had in the past, asking the military for counseling. Before he could get it, he went out looking for drugs, and when his money ran out, he attempted to rob a store.

For this second offense, he was discharged from the army and received a 60 day sentence, but he was also violated on the shoplifting charge and was sentenced to 9 months. Those two sentences comprise Mr. Vargas' criminal history in this case. He was released from jail in September, 2003, and returned to Massachusetts, where he was arrested in January, 2004 on this offense.

Mr. Vargas was released on conditions, and returned to his job at Plenus Group, where he had worked before his arrest. He changed jobs in the summer, moving back to Cambridge Tool. During this period, he was not using drugs, he was living with and supporting his wife and 4 children, working steadily at his job, and he was involved in his church. This lasted until the fall of 2004, when he took a second job delivering pizzas at night for extra money. Again, he succumbed to cocaine. He reported to Dr. Presskreischer that he had even used cocaine with his mother during this time. He was violated after admitting to Pretrial Services that he had been using cocaine, and remains incarcerated.

This history, as Dr. Presskreischer points out, is remarkable in several ways. Given his scarred childhood and his long-standing drug dependency, it is remarkable that Mr. Vargas has, repeatedly, made efforts to avoid falling into the culture of crime and drugs that was all around him. He has a criminal record, but as Dr. Presskreischer notes, "it could be anticipated that Mr. Vargas would have a lengthy criminal record replete with crimes of violence and serious injury to others. . . . Although [he] has clearly engaged in criminal behavior. He has developed a level of control over his aggression that is remarkable in the context of both his history and his use of disinhibiting

drugs." In his efforts, thus far not ultimately successful, to avoid drug use, he has sought out structured environments: the army, the Job Corps, a military-style program ("Project Challenge") when he lived in upstate New York. Mr. Vargas has, despite his repeated falls, been able to maintain his marriage and support his family, and he retains his dream that he can provide a middle-class lifestyle for them.

The Presentence Report notes that Mr. Vargas' wife feared that the loss of Mr. Vargas to the family might result in them losing their apartment, putting her and their four children, ages 5 months to 6 years, in jeopardy. It also notes that the oldest child is already exhibiting signs of the behavior Mr. Vargas exhibited as a child, and that Ms. Ruiz (Mr. Vargas' wife) suffers from depression and anxiety. It further notes that Mr. Vargas' mother stated she could not take in his family. Further, her own drug problems counsel against this. Based on these facts, the Probation Officer noted a possible ground for departure under mandatory guidelines for extraordinary family circumstances.

Mr. Vargas agrees that Mr. Vargas' large, young family and vulnerable wife present extraordinary grounds that would have supported a departure under the pre-*Booker* guidelines. These facts reinforce that a sentence below the guideline range, under a section 3553 analysis, is warranted.

B. The Requested Sentence is Sufficient to Satisfy the Requirements of Section 3552(a)(2).

This history, and Mr. Vargas' continuing aspirations for himself and his family, both counsel that a lower sentence, coupled with a recommendation to the Bureau of Prison's residential drug treatment program, is warranted in this case. Mr. Vargas' criminal behavior has been driven by drugs. Countering that, he has repeatedly, though unsuccessfully, sought to disengage himself. He

has managed to hold jobs, and maintain relationships, over the long term. He is motivated to engage, and engage fully, in drug abuse treatment, in order to put himself and his family on track to living a better life than he did as a child. Because his offense involves possessing firearms, the Bureau of Prisons will not reduce his sentence for successful completion of the residential program, see BOP Program Statement 5162.04, at 9 (Attachment A hereto). This is an additional reason to consider a sentence below that counseled by the guidelines alone.

A sentence of two years satisfies the sentencing mandates of section 3553, and more is unnecessary to effectuate them. Mr. Vargas' relatively minor criminal history, which falls in the same time period as this offense, coupled with the history set out above and his motivation to work on his drug problem, counsels that this sentence will be more than sufficient to deter him from future criminal activity and protect the public. In addition, he will be subject to probation supervision for an additional period of time after release, during which, he will be subject to drug monitoring and can be subject to further drug counseling or treatment.

A two year sentence is sufficiently grave to promote respect for the law and provide just punishment. It is hardly a slap on the wrist, and reflects the gravity of the offense. Given Mr. Vargas' history and family circumstances, it remains a severe sentence for the crime, and will be seen as such for purposes of general deterrence.

Finally, the additional request that the defendant undergo the residential drug treatment program, and that he be designated to a facility that has such a program, will satisfy the final requirement of section 3553(a)(2).

    C.    <u>A Sentence Of Probation Is Sufficient To Avoid Unwarranted Disparities Among Similarly Situated Defendants.</u>

A two year sentence is sufficient to promote the need to avoid *unwarranted* sentence disparities among defendants who have been found guilty of similar conduct. Assuming that the guideline sentence in this case has been applied historically, pre-*Booker,* this is not a ground to assume that post-*Booker* sentencing outside of that range will create unwarranted disparity. All sentencings must now be informed by all of the section 3553(a) factors, and those in Mr. Vargas' circumstances warrant the sentence he has requested. To ignore the additional factors introduced by section 3553 in determining what is a "warranted" disparity is to elevate the guidelines above those factors, which is unsupportable, given the post-*Booker* statutory scheme.

D.   <u>Even If the Guidelines Were Still Mandatory, A Departure Would Be Appropriate Because One Or More Departure Grounds Apply.</u>

Under the old mandatory guidelines regime, the court, as argued above, could depart downward based on extraordinary circumstances not adequately accounted for within the Guidelines framework. See U.S.S.G. § 5K2.0 . Mr. Vargas' very young, economically and emotionally fragile family, which without him has no means of support, and leaves his wife to deal with her own, and her son's emotional disabilities alone, are grounds to reduce the guideline sentence and get him back to supporting his family as soon as is reasonably practicable. There are no substitute family members that can help Mr. Vargas' family in his absence. His mother is both unsuitable and unable to take them in.

Although family circumstances was a "discouraged" departure ground, see §5H1.6, it was nonetheless available in extraordinary circumstances. This very young, very fragile family's plight qualifies as such a circumstance.

And, even if it did not, it certainly now has extra-guidelines weight, as a factor under section

3553(a)(1). For this reason the First Circuit left open the possibility of a sentence below the guidelines range in *Antonakopoulos, supra*, where Judge Woodlock had rejected a guidelines departure because he was persuaded there were alternative means of care for the defendant's ill son. 399 F.3d at 74.

**CONCLUSION**

For all of the foregoing reasons, the defendant requests that this Court sentence him to a two year sentence, with judicial recommendations that he be admitted to the Bureau of Prisons' 500 hour residential drug treatment program and that he be designated to FCI Fort Dix, or if that facility is not available, to the nearest facility to the defendant's family that has a residential drug treatment program.

By his Attorney,

/s/ David Duncan (BBO #546121)
Zalkind, Rodriguez, Lunt & Duncan, LLP
65a Atlantic Avenue
Boston, MA  02110
(617) 742-6020

May 20, 2005